UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

ALLEGIANCE TELECOM, INC., et al.,

                Debtors.
-----------------------------------------------------------x
EUGENE I. DAVIS, AS THE PLAN
ADMINISTRATOR OF ALLEGIANCE
TELECOM LIQUIDATING TRUST,

                Appellant,

       -against-

XO COMMUNICATIONS, LLC,

                Appellee.
-----------------------------------------------------------x

11 Civ. 8229 (PKC)

Chapter 11 Case No.
03-13057 (RDD)
(Jointly Administered)

MEMORANDUM
AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-28-12

CASTEL, District Judge:

       This is an appeal from an order of the bankruptcy court (Robert D. Drain, U.S.B.J.) determining that the buyer of assets from the debtors was entitled to approximately $8 million, representing a portion of the purchase price paid into escrow by the buyer, plus accumulated interest. The successor-in-interest to the debtors appeals, arguing that the debtors, as the sellers of the assets, are entitled to the funds, which were part of the purchase price. For reasons explained, the order of the bankruptcy court is vacated.

## BACKGROUND

       Allegiance Telecom, Inc., and Allegiance Telecom Company Worldwide (collectively, "Allegiance") filed a voluntary Chapter 11 petition on May 14, 2003. Thereafter, Allegiance entered into an Asset Purchase Agreement (the "APA") with XO Communications, LLC ("XO"), whereby Allegiance agreed to sell substantially all of its assets, a telecommunications business (the "Business"), for a purchase price of $311 million plus a

specified number of shares of XO common stock. (See Order, Feb. 20, 2004, Bankr. Ct. Docket No. 980, Ex. A.) The APA was approved by the bankruptcy court on February 20, 2004. (Order, Feb. 20, 2004.)

According to the APA, in the event that XO began operating the Business before the sale closed, XO would pay the purchase price immediately but would deposit a portion of the purchase price in an escrow account (the "Adjustment Escrow Account"). (APA § 3.2(b).) The funds in the escrow account would cover adjustments to the purchase price necessitated by any discrepancy between Allegiance's estimate of the working capital of the Business and the actual working capital on the day XO took over operations (the "Final Working Capital"). (Id. § 3.4.) The APA provided that any adjustments to the purchase price were to be paid exclusively out of the escrowed funds, with the balance, if any, paid to Allegiance, as follows:

> Any payment [Allegiance is] obligated to make to [XO] pursuant to [the price adjustment provisions] shall be paid from the Adjustment Escrow Account plus accrued interest thereon. After payment of any required amounts pursuant to [the price adjustment provisions], the Adjustment Escrow Agent shall release the residual amounts of the Adjustment Escrow Amount remaining in the Adjustment Escrow Account to [Allegiance].

(Id. § 3.2(iii).)

The APA further provided that XO's assessment of the working capital of the Business on the day it took over operations would become the Final Working Capital—and become the basis for purchase price adjustments—unless Allegiance disputed the assessment. (Id. § 3.4(i).) In the event Allegiance did dispute XO's assessment, Allegiance and XO were to submit the dispute to an "Accounting Referee," whose decision would be final and binding. (Id. § 3.4(d).)

On June 12, 2007, the parties commenced an accounting proceeding before an Accounting Referee (the "Accounting Proceeding"). (See Corrected Memorandum of Decision,

December 8, 2006, Bankr. Ct. Docket No. 2419, at 24-29.) The bankruptcy court stayed an adversary proceeding relating to the working capital adjustments pending the delivery of the Accounting Referee's report. (Id. at 29.)

While the Accounting Proceeding was pending, the parties reached a global settlement (the "Settlement Agreement") of many and varied disputes of which the Accounting Proceeding was but one. (See Order Authorizing and Approving the Settlement and Mutual Release, Nov. 5, 2008, Bankr. Ct. Docket No. 2666, Ex. A.) The Settlement Agreement, which was approved by the bankruptcy court on November 5, 2008, required Allegiance to pay XO the net amount of $57,396,904.61. (Id. Art. I.E.) The net figure included a credit in the aggregate amount of $2,897,591 in favor of Allegiance "in full satisfaction of all of the Parties' respective claims and counterclaims" in the Accounting Proceeding and certain other litigations. (Id. Whereas Cl. ¶ Z; Arts. I.D.1, I.E.) The Settlement Agreement does not otherwise explain how the $2,897,591 figure was calculated.

As part of the Settlement Agreement, the parties agreed to notify the Accounting Referee that they had discontinued the Accounting Proceeding. (Id. Art. II.A.2.) Elsewhere, the Settlement Agreement contained broad and sweeping mutual releases of "any and all claims . . . for any reason whatsoever, arising from or in any way related to the APA." (Id. Art. II.C.1-2.) The Settlement Agreement—and the application to the Court for its approval—are silent as to the disposition of the escrowed funds. The Court approved the Settlement Agreement on November 5, 2008.

Two and one-half years after the Settlement Agreement, and about seven months after the closing of the Chapter 11 cases, the Plan Administrator, as successor-in-interest to Allegiance, moved to reopen the debtors' cases because the "debtor inadvertently fail[ed] to administer assets prior to the closing of the bankruptcy case." (Motion of Plan Administrator,

May 10, 2011, Bankr. Ct. Docket No. 2689, at 4.) The bankruptcy cases were reopened by Order of June 1, 2011 (Bankr. Ct. Docket No. 2693.)[1] Thereafter, the Plan Administrator moved for an "Order Enforcing [the] Settlement Agreement . . . and Determining Ownership of Escrowed Funds." (Bankr. Ct. Docket No. 2695.) XO cross-moved "Seeking Release to It of [the] Escrowed Funds" and objecting to the Plan Administrator's motion. (Bankr. Ct. Docket No. 2697.)

Judge Drain held a hearing on the motions, at the conclusion of which he expressed a "preliminary view." (Hr'g Tr. 56, July 26, 2012.) The bankruptcy court tentatively concluded that because XO placed the money into the escrow, it had a reversionary interest in the money. (Id. at 61.) After receiving further briefing on the issue, the bankruptcy court issued an order on October 17, 2011, denying Allegiance's motion, granting XO's cross-motion and directing the escrow agent to release the funds to XO. (Order, Oct. 17, 2011, Bankr. Ct. Docket No. 2711.) This appeal followed.

## STANDARD OF REVIEW

The legal conclusions of the bankruptcy court are reviewed *de novo*. In re Zarnel, 619 F.3d 156, 161 (2d Cir. 2010). Its factual determinations are reviewed for clear error. In re Penn Traffic Co., 524 F.3d 373, 378 (2d Cir. 2008); Rule 8013, Fed. R. Bankr. P.

## DISCUSSION

Under New York law,[2] a contract "must be enforced according to the plain meaning of the language chosen by the contracting parties. . . ." Brad H. v. City of New York, 17 N.Y.3d 180, 185 (2011) (internal citations omitted). Differing contractual interpretations

---

[1] The Plan Administrator had applied for and, on October 26, 2010, was granted a final decree closing Allegiance's Chapter 11 cases.

[2] The APA, the Escrow Agreement and the Settlement Agreement contain New York choice of law provisions. (See APA § 9.5; Order, Feb. 20, 2004, App'x APA ("Purchase Price Escrow Agreement"), ¶ 12; Settlement Agreement Art. 5.1.)

offered by parties to a controversy do not amount to an ambiguity in the original contract. See Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992) (applying New York law). "Interpretation of an unambiguous contract provision is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument." Chimart Assocs. v. Paul, 66 N.Y.2d 570, 572–73 (1986) (quoting Teitelbaum Holdings v. Gold, 48 N.Y.2d 51, 56 (1979)). The APA and the Settlement Agreement contain broad merger clauses (APA § 9.6; Settlement Agreement Art. V.E), and "the purpose of a general merger provision . . . is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing . . . ." Primex Intern. Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 599 (1997). "When parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 N.Y.3d 470, 475 (2004) (quoting W.W.W. Assoc. v Giancontieri, 77 N.Y.2d 157, 162 (1990)).

In this case, the APA and the Settlement Agreement are complete, integrated agreements, and the terms of these agreements dictate that Allegiance is entitled to the funds in the escrow account. The Settlement Agreement unambiguously provides that "[t]he Parties shall, through their attorneys, jointly notify the Accounting Referee that the Parties have discontinued the Accounting Proceeding." (Settlement Agreement Art. II.A.2.) With the claims of the parties mutually released and the Accounting Proceeding "discontinued," XO could no longer be entitled to an adjustment in the purchase price from the escrowed funds. In that circumstance, section 3.2(iii) of the APA unambiguously dictated the rights of the parties: "After payment of any required amounts pursuant to [the price adjustment provisions], the Adjustment Escrow Agent shall release the residual amounts of the Adjustment Escrow Amount remaining in the

Adjustment Escrow Account to [Allegiance]." Thus, Allegiance became contractually entitled to the balance of the escrowed money. This result is consistent with the intent of the parties, as expressed in the APA, that the sum placed in escrow was part of the purchase price that XO was paying to Allegiance. (APA § 3.2.)

XO argues that Allegiance's release of claims in the Settlement Agreement included a release of any claim Allegiance may have had to the escrowed funds. But XO concedes, as it must, that its own release of claims also released any claim that it had to the escrowed funds. Under XO's theory, neither party had an entitlement to the escrowed funds following the execution of the Settlement Agreement. In this circumstance, XO asserts, the ownership of the funds should be determined in accordance with New York common law which, it asserts, would require the return of the funds to the person depositing them.

XO's theory is flawed because Allegiance had no legitimate right to the escrowed funds while the Accounting Proceeding was pending. Once the Accounting Proceeding was discontinued and XO released any claim it had to a purchase price adjustment, then Allegiance could make a demand on the escrow agent for payment of the funds. Accordingly, Allegiance's right to make a demand on the escrow agent did not mature until after the discontinuance and release, and that right was not itself released by the Settlement Agreement. Therefore, the APA dictated the disposition of the funds.

Further, XO's view of New York law on revisionary interests in escrowed funds is strained. It relies upon 99 Commercial St. Inc. v. Goldberg, 811 F. Supp. 900 (S.D.N.Y. 1993), in which the question before then-Judge Sotomayor was whether a party who had deposited funds with an attorney-escrow agent who, in turn, deposited the funds with a broker-dealer was bound by an arbitration agreement signed by the attorney-escrow agent. The party who opposed arbitration conceded that he was told that the escrowed funds would be placed on

deposit with the specified broker-dealer, who required customer agreements with arbitration provisions from all customers. Id. at 903. The Court concluded that "[b]*oth* parties to an escrow agreement own the escrow account for purposes of acts that an escrow agent undertakes in accordance with the terms of the escrow agreement." Id. at 905 (emphasis in original). The Court noted that certain incidents of ownership remain with the party depositing the funds, citing a case decided by Judge Duffy concerning the obligation to pay interest on a promissory note held in escrow, which, in turn, cited a state trial court decision addressing shareholder notice when shares are held in escrow. Id. (citing Press v. Marvalan Indus., Inc., 422 F.Supp. 346, 349 (S.D.N.Y.1976) (in turn citing Alexander v. Quality Leather Goods Corp., 150 Misc. 577, 269 N.Y.S. 499 (N.Y. Sup. Ct.1934))). None of the cited authorities stands for the proposition that the depositor of funds in escrow has an immutable right to their return. There is no claimed support in New York law that the parties to a contract may not agree upon the disposition of escrowed funds, as XO and Allegiance did in the APA.

## CONCLUSION

The October 17, 2011 Order of the bankruptcy court is vacated and the matter referred to the bankruptcy court with direction to grant the motion of Allegiance and deny the motion of XO.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        March 28, 2012